## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### BLUEFIELD DIVISION

| | | |
|---|---|---|
| **BRENDA ROGERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 1:07-00626** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### PROPOSED FINDINGS AND RECOMMENDATION

This is an action seeking review of the final decision of the Commissioner of Social Security

denying the Plaintiff's application for Supplemental Security Income (SSI) under Title XVI of the

Social Security Act, 42 U.S.C. §§ 1381-1383f. By Standing Order (Document No. 4.), this case was

referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence,

and to submit Proposed Findings of Fact and Recommendation for disposition, all pursuant to 28

U.S.C. § 636(b)(1)(B). Presently pending before the Court is Plaintiff's Motion for Summary

Judgment (Document No. 10.) and the Defendant's Motion for Judgment on the Pleadings.

(Document No. 12.)

The Plaintiff, Brenda Rogers (hereinafter referred to as "Claimant"), filed an application for

SSI on September 26, 2005 (protective filing date), alleging disability as of August 1, 2001, due to

a learning disability.[1] (Tr. at 46, 47-52, 85.) The claims were denied initially and upon

reconsideration. (Tr. at 33-35, 38-40.) On June 22, 2006, Claimant requested a hearing before an

Administrative Law Judge (ALJ). (Tr. at 41.) The hearing was held on December 5, 2006, before

---

[1] On her form Disability Report - Adult, Claimant reported that her learning disability limited her ability to work because she could neither read nor write. (Tr. at 86.)

the Honorable Karen B. Peters. (Tr. at 197-241.) By decision dated March 13, 2007, the ALJ determined that Claimant was not entitled to benefits. (Tr. at 15-23.) The ALJ's decision became the final decision of the Commissioner on August 13, 2007, when the Appeals Council denied Claimant's request for review. (Tr. at 5-8.) On October 8, 2007, Claimant brought the present action seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g). (Document No. 1.)

Under 42 U.S.C. § 423(d)(5) and § 1382c(a)(3)(H)(I), a claimant for disability benefits has the burden of proving a disability. See Blalock v. Richardson, 483 F.2d 773, 774 (4th Cir. 1972). A disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable impairment which can be expected to last for a continuous period of not less than 12 months . . . ." 42 U.S.C. § 423(d)(1)(A).

The Social Security Regulations establish a "sequential evaluation" for the adjudication of disability claims. 20 C.F.R. §416.920 (2006). If an individual is found "not disabled" at any step, further inquiry is unnecessary. Id. § 416.920(a). The first inquiry under the sequence is whether a claimant is currently engaged in substantial gainful employment. Id. § 416.920(b). If the claimant is not, the second inquiry is whether claimant suffers from a severe impairment. Id. § 416.920(c). If a severe impairment is present, the third inquiry is whether such impairment meets or equals any of the impairments listed in Appendix 1 to Subpart P of the Administrative Regulations No. 4. Id. § 416.920(d). If it does, the claimant is found disabled and awarded benefits. Id. If it does not, the fourth inquiry is whether the claimant's impairments prevent the performance of past relevant work. 20 C.F.R. § 416.920(e). By satisfying inquiry four, the claimant establishes a prima facie case of disability. Hall v. Harris, 658 F.2d 260, 264 (4th Cir. 1981). The burden then shifts to the Commissioner, McLain v. Schweiker, 715 F.2d 866, 868-69 (4th Cir. 1983), and leads to the fifth

and final inquiry: whether the claimant is able to perform other forms of substantial gainful activity, considering claimant's remaining physical and mental capacities and claimant's age, education and prior work experience. 20 C.F.R. § 416.920(f) (2006). The Commissioner must show two things: (1) that the claimant, considering claimant's age, education, work experience, skills and physical shortcomings, has the capacity to perform an alternative job, and (2) that this specific job exists in the national economy. McLamore v. Weinberger, 538 F.2d 572, 574 (4th Cir. 1976).

When a claimant alleges a mental impairment, the Social Security Administration "must follow a special technique at every level in the administrative review process." 20 C.F.R. §§ 404.1520a(a) and 416.920a(a). First, the SSA evaluates the claimant's pertinent symptoms, signs and laboratory findings to determine whether the claimant has a medically determinable mental impairment and documents its findings if the claimant is determined to have such an impairment. Second, the SSA rates and documents the degree of functional limitation resulting from the impairment according to criteria as specified in 20 C.F.R. §§ 404.1520a(c) and 416.920a(c). Those sections provide as follows:

> *(c) Rating the degree of functional limitation.* (1)Assessment of functional limitations is a complex and highly individualized process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation. We will consider all relevant and available clinical signs and laboratory findings, the effects of your symptoms, and how your functioning may be affected by factors including, but not limited to, chronic mental disorders, structured settings, medication and other treatment.
>
> (2) We will rate the degree of your functional limitation based on the extent to which your impairment(s) interferes with your ability to function independently, appropriately, effectively, and on a sustained basis. Thus, we will consider such factors as the quality and level of your overall functional performance, any episodic limitations, the amount of supervision or assistance you require, and the settings in which you are able to function. See 12.00C through 12.00H of the Listing of Impairments in appendix 1 to this subpart for more information about the factors we consider when we rate the degree of your functional limitation.
>
> (3) We have identified four broad functional areas in which we will rate the degree of your functional limitation: Activities of daily living; social functioning;

concentration, persistence, or pace; and episodes of decompensation. See 12.00C of the Listings of Impairments.

(4) When we rate the degree of limitation in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace), we will use the following five-point scale: None, mild, moderate, marked, and extreme. When we rate the degree of limitation in the fourth functional area (episodes of decompensation), we will use the following four-point scale: None, one or two, three, four or more. The last point on each scale represents a degree of limitation that is incompatible with the ability to do any gainful activity.

Third, after rating the degree of functional limitation from the claimant's impairment(s), the SSA determines their severity. A rating of "none" or "mild" in the first three functional areas (activities of daily living, social functioning; and concentration, persistence, or pace) and "none" in the fourth (episodes of decompensation) will yield a finding that the impairment(s) is/are not severe unless evidence indicates more than minimal limitation in the claimant's ability to do basic work activities. 20 C.F.R. §§ 404.1520a(d)(1) and 416.920a(d)(1).[2] Fourth, if the claimant's impairment(s) is/are deemed severe, the SSA compares the medical findings about the severe impairment(s) and the rating and degree and functional limitation to the criteria of the appropriate listed mental disorder to determine if the severe impairment(s) meet or are equal to a listed mental disorder. 20 C.F.R. §§ 404.1520a(d)(2) and 416.920a(d)(2). Finally, if the SSA finds that the claimant has a severe mental

---

[2] 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.04, provides that affective disorders, including depression, will be deemed severe when (A) there is medically documented continuous or intermittent persistence of specified symptoms and (B) they result in two of the following: marked restriction of activities of daily living; marked difficulties in maintaining social functioning; marked difficulties in maintaining concentration, persistence or pace; or repeated episodes of decompensation , each of extended duration or (C) there is a medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities with symptoms currently attenuated by medication or psychosocial support and (1) repeated extended episodes of decompensation; (2) a residual disease process resulting in such marginal adjustment that a minimal increase in mental demands or change in the environment would cause decompensation; or (3) a current history of 1 or more years' inability to function outside a highly supportive living arrangement, and the indication of a continued need for such an arrangement.

impairment(s) which neither meets nor equals a listed mental disorder, the SSA assesses the Claimant's residual functional capacity. 20 C.F.R. §§ 404.1520a(d)(3) and 416.920a(d)(3). The Regulation further specifies how the findings and conclusion reached in applying the technique must be documented at the ALJ and Appeals Council levels as follows:

> At the administrative law judge hearing and the Appeals Council levels, the written decision issued by the administrative law judge and the Appeals Council must incorporate the pertinent findings and conclusions based on the technique. The decision must show the significant history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the severity of the mental impairment(s). The decision must include a specific finding as to the degree of limitation in each of the functional areas described in paragraph (c) of this section.

20 C.F.R. §§ 404.1520a(e)(2) and 416.920a(e)(2).

In this particular case, the ALJ determined that Claimant satisfied the first inquiry because she had not engaged in substantial gainful activity since August 1, 2001, the alleged onset date. (Tr. at 17, Finding No. 1.) Under the second inquiry, the ALJ found that Claimant suffered from mild mental retardation, which was a severe impairment. (Tr. at 17, Finding No. 2.) At the third inquiry, the ALJ concluded that Claimant's impairments did not meet or equal the level of severity of any listing in Appendix 1. (Tr. at 18-19, Finding No. 3.) The ALJ then found that Claimant had a residual functional capacity

> to perform a limited range of medium exertion work activities. The claimant can lift or carry 25 pounds frequently, 50 pounds occasionally, and can sit, stand, or walk about 6 hours each in an 8 hour day. The claimant can perform frequent bending, stooping, crouching, crawling, kneeling, balancing and climbing. The claimant has no visual, communicative, environmental, or manipulative limitations. The claimant is limited to non public low stress simple, non-complex jobs that do not require reading, writing, or math skills.

(Tr. at 19, Finding No. 4.) At step four, the ALJ found that Claimant could not return to her past relevant work. (Tr. at 21, Finding No. 5.) On the basis of testimony of a Vocational Expert ("VE")

taken at the administrative hearing, the ALJ concluded that Claimant could perform jobs such as a house cleaner and dishwasher, at the medium level of exertion. (Tr. at 22, Finding No. 9.) On this basis, benefits were denied. (Tr. at 22, Finding No. 10.)

Scope of Review

The sole issue before this Court is whether the final decision of the Commissioner denying the claim is supported by substantial evidence. In Blalock v. Richardson, substantial evidence was defined as:

> evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance. If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is 'substantial evidence.'

Blalock v. Richardson, 483 F.2d 773, 776 (4th Cir. 1972) (quoting Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966)). Additionally, the Commissioner, not the Court, is charged with resolving conflicts in the evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Nevertheless, the Courts "must not abdicate their traditional functions; they cannot escape their duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." Oppenheim v. Finch, 495 F.2d 396, 397 (4th Cir. 1974).

Claimant's Background

Claimant was born on August 28, 1960, and was 45 years old at the time of the administrative hearing. (Tr. at 21, 47.) Claimant had a sixth grade, or limited, education and was able to communicate in English. (Tr. at 21, 85, 88, 203, 206-09.) In the past, she worked as a buffet worker, sandwich maker, fast food worker, and housekeeper. (Tr. at 21-22, 209-12, 237.)

The Medical Record

The Court has reviewed all evidence of record, including the medical evidence, and will discuss it below as it relates to Claimant's arguments.

Claimant's Challenges to the Commissioner's Decision

Claimant argues that the Commissioner's decision is not supported by substantial evidence because the ALJ improperly analyzed her mental impairment and that she met the diagnostic criteria for Listing 12.05C of the listings of impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.05, Mental Retardation. (Document No. 11 at 5-10.) Claimant asserts that the IQ scores obtained during the two consultative psychological evaluations satisfy the first prong of § 12.05C, and that the second prong is met by her "anxiety, depression, and insomnia, which the ALJ failed to properly consider." (Id. at 9.) Claimant notes that during the February 9, 2006, psychological evaluation, she was diagnosed with depressive disorder and a global assessment of functioning [GAF] of 51, and that counseling was recommended to address her depressive symptoms, self-defeating behaviors, self-esteem issues, and substance abuse history. (Id.) She further notes that the February 21, 2006, psychological evaluation yielded a diagnosis of generalized anxiety disorder and opinions that there were deficiencies in her adaptive behavioral functioning. (Id. at 9-10.) Claimant therefore maintains that the two evaluations support an additional impairment that satisfies the second prong of § 12.05C. (Id.)

Citing Hodges v. Barnhart, 276 F.3d 1265, 1266 (11th Cir. 2001), Claimant further argues that she is not required to produce evidence that she manifested deficits in adaptive functioning prior to age 22 because it is presumed that her IQ scores, which are indicative of mild mental retardation, "create a rebu[t]table presumption of a fairly constant IQ score throughout [her] life." (Document No. 11 at 8.) Consequently, Claimant asserts that her IQ scores obtained after age 22 reflect her intellectual functioning prior to age 22, and therefore establish that she had deficiencies in adaptive functioning prior to age 22. (Id.)

The Commissioner asserts that Claimant's arguments are without merit and that substantial

evidence supports the ALJ's decision. (Document No. 12 at 7-12.) Though Claimant's IQ scores met the criteria for § 12.05C, the Commissioner essentially asserts that the test for mental retardation under Listing 12.05C is a three-part one and that Claimant "did not have the requisite deficits in adaptive functioning." (Id. at 7-8.) The Commissioner emphasizes that consultative examiners Ms. Taylor and Ms. Smith found that Claimant's "day-to-day living skills demonstrated that she functioned adaptively on a higher level and they found no evidence of Plaintiff's being diagnosed with mental retardation prior to age 22." (Id. at 8.) Furthermore, the reviewing state agency physicians opined that Claimant's impairments did not meet any listing impairment. (Id.) The Commissioner further notes that Claimant's wide range of activities and her work history demonstrate that she was not limited by her intellectual functioning. (Id. at 8-9.) Finally, the Commissioner asserts that notwithstanding Claimant's IQ scores, she failed to demonstrate that she had another impairment imposing additional or significant work-related limitations of function. (Id. at 9-10.) The Commissioner notes that Claimant did not receive any mental health treatment or take any medication for a mental impairment and had not been hospitalized for a mental disorder. (Id. at 10.) Though Ms. Taylor and Ms. Smith opined that Claimant's GAF was 51, the assessment was based on Claimant's self-reports and was at odds with Claimant's "relatively normal mental status." (Id.) The opinions of the reviewing state agency physicians confirms the absence of an additional impairment. (Id.)

Analysis.

"The Listing of Impairments describes, for each of the major body systems, impairments that are considered severe enough to prevent an adult from doing any gainful activity," regardless of age, education or work experience, see Sullivan v. Zebley, 493 U.S. 521, 532, 110 S.Ct. 885, 892, 107 L.Ed.2d 967 (1990); 20 C.F.R § 416.925(a) (2006). Section 12.05 of the Listing of Impairments

provides criteria for determining whether an individual is disabled by mental retardation or autism. "Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05 (2006). The required level of severity for Listing 12.05 is satisfied when any one of the four following requirements is satisfied:

> A. Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow directions, such that the use of standardized measures of intellectual functioning is precluded;

OR

> B. A valid verbal, performance, or full scale IQ of 59 or less;

OR

> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

OR
> D. A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:
> 1. Marked restriction of activities of daily living; or
> 2. Marked difficulties in maintaining social functioning; or
> 3. Marked difficulties in maintaining concentration, persistence, or pace; or
> 4. Repeated episodes of decompensation, each of extended duration.

Because the evidence does not establish that Claimant was dependent on others for personal needs, that she had an IQ of 59 or less, or that she had marked restrictions or repeated episodes of decompensation, the ALJ focused her analysis on the absence of deficits in adaptive behavior and an additional impairment resulting in limitations required under subsection "C." To meet the criteria of § 12.05C, Claimant must show "[a] valid verbal, performance, or full scale IQ of 60 through 70

and a physical or other mental impairment imposing an additional and significant work-related limitation of function." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05C (2006). The Fourth Circuit has held that a claimant's additional "severe" impairment qualifies as a significant work-related limitation for the purpose of listing § 12.05C. Luckey v. United States Dep't of Health & Human Serv., 890 F.2d 666 (4th Cir. 1989) (per curiam). A "severe" impairment is one "which significantly limits [one's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1520(c); 416.920(c) (2006). In Luckey, the Court ruled that:

> Luckey's inability to perform his prior relevant work alone established the significant work-related limitation of function requirement of section 12.05C. Further, the Secretary has defined a severe impairment or combination of impairments as those which significantly limit an individual's physical or mental ability to do basic work activities. The Secretary's finding that Luckey suffers from a severe combination of impairments also establishes the second prong of section 12.05C.

Id. at 669 (internal citations omitted).

As described in the introduction to the Listing, and as stated by the ALJ, one of the essential features of mental retardation is significant deficits in adaptive functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00; See also The Merck Manual of Diagnosis and Therapy 2491(Mark H. Beers, M.D. & Robert S. Porter, M.D., eds., 18th ed. 2006) (defining mental retardation as "significantly subaverage intellectual functioning (often expressed as an intelligent quotient < 70 to 75) combined with limitations of > 2 of the following: communication, self-direction, social skills, self-care, use of community resources, and maintenance of personal safety. Management consists of education, family counseling, and social support).[3] Also, according to the Diagnostic and Statistical Manual

---

[3] "In 1992 the American Medical Association on Mental Retardation changed the definition of mental retardation to reflect adaptation to the environment and interaction with others by a person with limited intellectual functioning.  Classification based on IQ alone (mild, 52 to 68; moderate, 36 to 51, severe, 20 to 35; profound, less than 20) has been replaced to that based on level of support needed." *The Merck Manual of Diagnosis and Therapy* 2259 (Mark H. Beers, M.D. & Robert

of Mental Disorders, 4th Edition, (DSM-IV)(1994), one of the essential features of mental retardation is significant deficits in adaptive functioning. Id. at 39-40. Adaptive functioning refers to how effectively an individual copes with common life demands and how well she meets the standards of personal independence expected of someone in her particular age group, sociocultural background, and community setting. Id. at 40. Despite Claimant's argument to the contrary, the Regulations make clear that Listings 12.05C is a three-part test. The Introduction to section 12.00 of the Listings, section 12.00A, was revised in 2000 to state as follows:

> The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph and any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00A; 65 Fed. Reg. 50, 746, 50, 776; see also Foster v. Halter, 279 F.3d 348, 354 (6th Cir. 2001) (detailing change).

The Commissioner essentially asserts that section 12.05C is a three-part test, with the introductory paragraph ("significantly subaverage general intellectual functioning with deficits in adaptive behavior initially manifested during the developmental period") being the threshold requirement. Although the Fourth Circuit has not addressed this issue after the amendment to the Regulations, other Circuits have held that a claimant must meet the "deficits in adaptive functioning requirement" to meet all of the criteria for Listing 12.05C. See, e.g., Burrell v. Commissioner, 238 F.3d 419, 2000 WL 1827799 (6th Cir. Dec. 8, 2000) (receiving benefits under § 12.05 also requires a deficit in adaptive functioning); Justice v. Barnhart, 431 F.Supp.2d 617, 619 (W.D. Va. ("even if the record clearly establishes that the plaintiff meets the requirements of section 12.05(C), a finding

---

Berkow, M.D., eds., 17th ed. 1999).

of mental retardation cannot be warranted without a finding that the plaintiff manifested deficits in adaptive functioning before age 22.")(*citing* Mendez v. Barnhart, 439 F.3d 360, 362 (7th Cir. 2006)); Higgins v. Barnhart, 288 F. Supp. 2d 811 (S.D. Tex. 2002) (claimant failed to display adaptive functioning deficits despite requisite IQ scores). In Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992), the Eleventh Circuit held as follows:

> Generally, a claimant meets the criteria for presumptive disability under section 12.05C when the claimant presents a valid I.Q. score of 60 to 70 inclusive, and evidence of an additional mental or physical impairment that has more than 'minimal effect' on the claimant's ability to perform basic work activities. This court, however, has recognized that a valid I.Q. score need not be conclusive of mental retardation where the I.Q. score is inconsistent with other evidence in the record on the claimant's daily activities and behavior.

(internal citations omitted). This Court too has followed this approach. See Slaughter v. Barnhart, 1:03-cv-00058, March 29, 2004 Order, Doc. No. 18, aff'd, 2005 WL 430103 (4th Cir. Feb. 23, 2005).

In Hodges v. Barnhart, 276 F.3d 1265, 1266, 1269 (11th Cir. 2001), the case cited by Claimant, the Eleventh Circuit Court of Appeals held that "absent evidence of sudden trauma that can cause retardation," "there is a presumption that mental retardation is a condition that remains constant throughout life." Consequently, the Court further held that "a claimant need not present evidence that she manifested deficits in adaptive functioning prior to the age twenty-two, when she presented evidence of low IQ test results after the age of twenty-two." Id. at 1266. In Hodges, the claimant presented a verbal IQ of 67, which was obtained after age 22. Id. at 1267. The claimant testified that she had a seventh grade education and could not recall whether she received special education courses when in school. Id. She also testified that she had worked briefly at a fast food restaurant but had not worked for the fifteen years preceding the administrative hearing, though she had raised her seven children. Id. The Circuit Court found that it was error for the ALJ to have not

12

presumed from this evidence that the claimant manifested a mental disability prior to age 22, and therefore, remanded the case with directions that the ALJ determine whether there was "substantial evidence to rebut this presumption of a fairly constant mental capacity before the age of twenty-two." Id. at 1266, 1269. On remand, the Court specifically stated that the Commissioner could present evidence of the claimant's daily life to rebut the presumption. Id. at 1269.

Contrary to Claimant's argument, the Fourth Circuit has not held that low IQ scores alone satisfy the diagnostic criteria of Listing 12.05C of deficits in adaptive functioning such as to satisfy the three-prong test of § 12.05C. Rather, in Luckey, the Fourth Circuit held only that in the absence of either IQ scores in the developmental years or "evidence of a change in a claimant's intellectual functioning, it must be assumed that the claimant's IQ had remained relatively constant." Luckey, 890 F.2d 668. The undersigned recommends that the District Court decline to adopt the presumption as stated in Hodges that a valid IQ score between 60 and 70 creates a rebuttable presumption that a claimant manifested deficits in adaptive functioning prior to age 22. To recognize such a presumption ignores the express language of the Regulation that requires a claimant to satisfy the diagnostic description of mental retardation, i.e., deficits in adaptive functioning, and the two criteria set forth in § 12.05C. See Norris v. Astrue, 2008 WL 4911794 at *3 -4 (E.D. N.C. Nov. 14, 2008); Justice v. Barnhart, 431 F.Supp.2d 617, 619-20 (W.D. Va. 2006). At step three of the sequential analysis, the burden remains with the claimant to demonstrate that she meets or medically equals a Listing impairment. To find that low IQ scores create a rebuttable presumption of deficits in adaptive functioning, as did the Court in Hodges, shifts the burden to the Commissioner contrary to the language of the Regulations. The undersigned recommends that the District court continue the holdings of this Court and finds that Claimant must satisfy the three-part test of § 12.05C to establish that she was mentally retarded.

In the instant case, despite evidence of the requisite IQ scores, the ALJ nonetheless found that Claimant did not meet Listing 12.05C because there was no evidence that her mild mental retardation existed prior to the age 22, and there was no evidence of an additional and significant work-related limitation of function. (Tr. at 20.) The ALJ noted that Claimant testified that after quitting school in the seventh grade, she went to the library and read children's books, and that she currently reads paperback books. (Tr. at 20-21, 203-09.) Claimant testified that she could write but had difficulty reading. (Id.) Claimant stated that when in school, she was placed in special education classes due to difficulty reading and received grades of "B's" and "C's." (Tr. at 20-21, 208.) The ALJ left open the record after the hearing for Claimant's attorney to submit her public school records, but none were submitted. (Tr. at 21, 240.) Nevertheless, Claimant acknowledged that she could write letters and that she wrote her responses on the documents submitted in connection with her application for benefits, after her sister-in-law read to her the questions. (Tr. at 20-21, 206-09.) The ALJ further noted Claimant's testimony that she capably raised two children who earned "A's" and "B's" in school, that she worked intermittently, that she had the ability to follow plots on television shows, and that she played Bingo. (Tr. at 21-22, 214, 221-22, 224, 232-34, 237.) The ALJ found that these activities established that Claimant had "the ability to understand and respond." (Tr. at 21.) The ALJ further found that Claimant "consistently demonstrated the ability to function independently, care for others, travel, relocate, socialize successfully with family and friends, manage her household finances, and maintain a household. The claimant's daily activities appear to be only restricted by her finances and interests." (Id.)

The ALJ also summarized the medical evidence of record. (Tr. at 18-19.) Claimant neither sought any mental health treatment nor took any medications for mental health problems at any time relevant to her claim for benefits. (Tr. at 21.) Rather, upon Claimant's allegations, the State arranged

14

two consultative psychological evaluations. (Tr. at 18-19, 147-51, 152-59.) The first of these evaluations was conducted on February 9, 2006, by Tammie L. Smith, M.A., and Jeannie M. Taylor, M.A.(Tr. at 18-19, 147-51.) Claimant reported to Ms. Smith and Ms. Taylor that she lived with her two daughters and had maintained several long-term relationships after her divorce. (Tr. at 18, 147.) Regarding her education, Claimant reported that she had experienced difficulty reading and understanding what she read since elementary school, that she quit school in the seventh grade after her mother died, that she was placed in special education classes in the third grade, and that she was retained a few times. (Tr. at 18, 148.) Claimant also reported that she was employed at a fast food restaurant where she had difficulty operating the cash register and that she quit after one month, having received a note from a co-worker which stated that Claimant was stupid. (Id.) Prior thereto, Claimant reported that she worked at a buffet bar for four months, worked making sandwiches and salads as seasonal employment, and cleaned houses with her sister for three to five months. (Id.) Claimant also reported that she used to consume a lot of alcohol, which resulted in public intoxication charges, but that she had reduced consumption to a couple of beers with her family. (Id.) Claimant reported that she lived near her brother and sister. (Id.)

On mental status exam, Ms. Smith and Ms. Taylor found that Claimant had good attention span, intact recent and remote memory status, tangential but coherent speech, a euthymic mood and appropriate affect. (Tr. at 18, 149.) Claimant was very animated when talking and was fidgety in her seat. (Id.) Claimant was very cooperative and friendly and easily established a rapport with Ms. Smith and Ms. Taylor. (Id.) Claimant reported a stable appetite and sleep difficulties in that it took her a while to fall asleep. (Id.) She further reported that she played Bingo, watched soap operas, played with her granddaughter, had a few friends through her family, was unable to drive because she was without a license, and that she had no difficulties paying bills on time and managing the

15

household duties by herself. (Id.)

Ms. Smith and Ms. Taylor's office administered the WAIS-III, which yielded a full scale IQ of 65 and a classification of mild mental retardation. (Tr. at 18, 149.) On the WRAT-3, Claimant's scores indicated a grade 2 reading and spelling level and a grade 3 arithmetic level. (Tr. at 18, 150.) The WAIS-III and WRAT-3 scores were considered valid, but Ms. Smith and Ms. Taylor opined that "[a]lthough [Claimant's] test scores fall within the mild mental retardation category, she does not meet all criteria for this diagnosis. Her day-to-day living skills show that she functions adaptively on a higher level and she also has no known previous history of being diagnosed with mental retardation prior to age 18." (Id.) Ms. Smith and Ms. Taylor diagnosed depressive disorder not otherwise specified, alcohol abuse in early partial remission, borderline intellectual functioning, and assessed a GAF of 51.[4] (Id.)

The second evaluation was conducted on February 21, 2006, by Teresa E. Jarrell, M.A. (Tr. at 19, 152-59.) Claimant reported a history of learning problems, anxiety, hot flashes, and poor vision. (Tr. at 19, 153.) Claimant also reported that she was scared to drive because she could not read the road signs, that she could not remember how to do things and messed up orders when working at McDonald's, that she was placed in special education classes in school, that she would get upset and cry when she could not help her children with their homework, that she had problems with her nerves which resulted in her inability to sleep, and that she experienced hot flashes. (Id.) Claimant presented her educational and vocational history as was presented to Ms. Smith and Ms. Taylor, with the exception that Claimant reported having been retained specifically in the third and

---

[4] The Global Assessment of Functioning ("GAF") Scale is used to rate overall psychological functioning on a scale of 0 to 100. GAF of 51-60 indicates that the person has moderate symptoms, or moderate difficulty in social, occupational or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-IV") 32 (4th ed. 1994).

fifth grades. (Id.)

On mental status exam, Ms. Jarrell found that Claimant had a mildly anxious mood and restricted affect; linear thought processes; relevant thought content; moderately deficient insight, judgment, and recent memory; and mildly deficient remote memory. (Tr. at 19, 155.) She noted that Claimant was alert, attentive, and cooperative, and was motivated toward task completion. (Id.) Clamant's speech was spontaneous with normal volume but was sometime halting in rate. (Id.) Ms. Jarrell's office also administered the WAIS-III, which yielded a full scale IQ of 67. (Id.) On the WRAT-3, Claimant's scores indicated a grade 2 reading and spelling level and a grade 3 arithmetic level. (Tr. at 19, 156.) Ms. Jarrell opined that the test scores were valid, but that they may have been elevated by a "practice affect," because of the tests administered by Ms. Smith and Ms. Taylor. (Tr. at 19, 156.)

Ms. Jarrell's diagnoses included generalized anxiety disorder, a history of alcohol abuse, mild mental retardation, and vision problems pursuant to Claimant's reports. (Tr. at 19, 156-57.) Ms. Jarrell's diagnosis of generalized anxiety disorder was based on Claimant's self-reports of excessive worry, restlessness, insomnia, and problems concentrating. (Tr. at 19, 156.) The diagnosis of mild mental retardation was based on Claimant's IQ scores, educational and vocational history, and the WRAT-3 results. (Tr. at 19, 157.) Additionally, Ms. Jarrell opined that "there do appear to be deficiencies in adaptive behavioral functioning in the area of functional academics, communication, and use of community resources." (Id.)

Ms. Jarrell noted that Claimant's daily activities included readying her daughters for school, watching television, maintaining the cleanliness of her residence independently, doing laundry, preparing one meal a day, maintaining her personal hygiene, and providing childcare. (Tr. at 19, 157.) Ms. Jarrell opined that Claimant's social functioning was mildly deficient because she had

returned to the area only recently and had not established friendships. (Id.) She further opined that Claimant's persistence was within normal limits but that her pace was mildly slow, based upon clinical observation. (Id.)

In addition to the two consultative evaluations, the State also arranged three psychiatric review techniques and mental residual functional capacity assessments. The first assessment was completed on March 2, 2005, by Roberto Gerstle, Ph.D., who opined that Claimant had no medically determinable impairment. (Tr. at 18, 21, 133-46.) The second assessment was performed on March 2, 2006, by Timothy Saar, Ph.D. (Tr. at 18-19, 21, 160-73, 174-77.) After reviewing Ms. Jarrell's evaluation, Dr. Saar opined that Claimant's mental retardation and generalized anxiety disorder resulted in only mild limitations in activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. at 18-19, 21, 164-72.) He further opined that Claimant's impairments only moderately limited her ability to understand, remember, & carry out detailed instructions; and to travel in unfamiliar places or use public transportation. (Tr. at 18-19, 21, 174-75.) Dr. Saar concluded that Claimant's mental impairments did not cause any severe functional limitations and that Claimant could "learn and perform repetitive work-like activities." (Tr. at 18-19, 21, 176.)

The third assessment was performed on May 13, 2006, by Holly Cloonan, Ph.D., who reviewed both Ms. Jarrell's and Ms. Smith and Ms. Taylor's evaluations. (Tr. at 18-19, 21, 178-81, 182-95.) Dr. Cloonan opined that Claimant's mental impairments, borderline intellectual functioning, depressive disorder, and alcohol abuse in early partial remission, resulted in mild limitations in Claimant's activities of daily living, social functioning, and concentration, persistence, or pace. (Tr. at 18-19, 21, 183-94.) Dr. Cloonan further opined that these mental impairments only moderately limited Claimant's ability to understand, remember, & carry out detailed instructions; to travel in unfamiliar places or use public transportation; and to set realistic goals or make plans

18

independently of others. (Tr. at 18-19, 21, 178-79.) Despite Claimant's borderline intellectual functioning, Dr. Cloonan concluded that Claimant was capable of learning and performing unskilled work-like activities. (Tr. at 18-19, 21, 180.)

Based on the foregoing, the undersigned finds support for the ALJ's decision that though Claimant's IQ scores satisfied the criteria of § 12.05C, Claimant's adaptive functioning was not significantly deficient prior to age 22. Although Claimant may have dropped out of school in the seventh grade, she testified that she could read with some difficulty and could write. She testified that after quitting school, she went to the library and read children's books and that she currently read paperback books. She further testified that she could write a letter and that she completed the forms related to her application for benefits, with her sister-in-law's assistance in reading the questions. Furthermore, the evidence supports the ALJ's finding that Claimant's day-to-day living skills demonstrated that she functioned adaptively on a level higher than indicated by her IQ scores alone. She cared for herself and her children independently, she independently maintained her residence and paid the bills, she watched television and was able to follow the story lines on soap operas, she played Bingo, she interacted with her family and friends, and she was able to travel and relocate.

The undersigned further finds support for the ALJ's decision that Claimant failed to present evidence of an additional and significant work-related limitation of function required under § 12.05C. Though Ms. Smith and Ms. Taylor diagnosed Claimant with a depressive disorder not otherwise specified, and Ms. Jarrell diagnosed generalized anxiety disorder, there is no evidence that these impairments resulted in significant functional limitations. Claimant's daily activities and her vocational history do not reflect any limitations resulting from these impairments. Furthermore, Drs. Saar and Cloonan both opined that Claimant's mental impairments resulted in no more than mild

limitations in activities of daily living and maintaining social functioning, concentration, persistence, or pace. Similarly, they opined that Claimant was only moderately limited in her abilities regarding detailed tasks, travel, and setting goals or plans. Though Ms. Smith and Ms. Taylor assessed a GAF of 51, as the Commissioner points out, that assessment was based on Claimant's self-reports and is inconsistent with the examiners' essentially normal mental status exam. The undersigned thus finds any error in the ALJ's failing to consider the GAF is harmless.[5]

Accordingly, the undersigned finds that the ALJ correctly applied the controlling Regulations and case law in finding that Claimant failed to satisfy the three-part test for Listing 12.05C, and that her decision is supported by substantial evidence.

For the reasons set forth above, it is hereby respectfully **RECOMMENDED** that the District Court confirm and accept the foregoing findings, **DENY** Plaintiff's Motion for Summary Judgment (Document No. 10.), **GRANT** the Defendant's Motion for Judgment on the Pleadings (Document No. 12.), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this matter from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED**, and a copy will be submitted to the Honorable David A. Faber, United States District Judge. Pursuant to the provisions of Title 28, United States Code, Section 636(b)(1)(B), and Rules 6(e) and 72(b), Federal Rules of Civil Procedure, the parties shall have three days (mailing/service) and then ten days (filing of objections) from the date of filing this Proposed Findings and Recommendation

---

[5] The undersigned notes that although the ALJ found that Claimant could not perform any of her past relevant work, that decision was based upon the finding that Claimant was limited to "non public low stress jobs that do not require reading, writing, or math skills." (Tr. at 21.) These factors however relate to Claimant's level of intellectual functioning, and therefore, do not constitute a finding of other severe impairments such as to make the ALJ's step four finding dispositive of the additional impairment requirement of § 12.05C. *See Luckey*. 890 F.2d at 669.

within which to file with the Clerk of this Court, specific written objections, identifying the portions of the Proposed Findings and Recommendation to which objection is made, and the basis of such objection.  Extension of this time period may be granted for good cause shown.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Circuit Court of Appeals. Snyder v. Ridenour, 889 F.2d 1363, 1366 (4th Cir. 1989); Thomas v. Arn, 474 U.S. 140, 155 (1985); Wright v. Collins, 766 F.2d 841, 846 (4th Cir. 1985); United States v. Schronce, 727 F.2d 91, 94 (4th Cir. 1984).  Copies of such objections shall be served on opposing parties, District Judge Faber, and this Magistrate Judge.

The Clerk is directed to file this Proposed Findings and Recommendation and to send a copy of the same to counsel of record.

Date: January 13, 2009.

R. Clarke VanDervort
United States Magistrate Judge